Here to meet and hear you, this Honorable Court for the Second Judicial District is now back in session. The Honorable Robert G. McClendon, Presiding Judge. Please be seated. Your Honor, the final case on the docket is 4-22-23-0212. Henry Romero v. Kathleen Myers, plaintiff at the lead, and Stephen Myers, respondent at the count. Arguing on behalf of the appellant, Ms. Robin Catlett. Arguing on behalf of the appellant, Ms. Phyllis Perko. Ms. Kelleflash, you may proceed. Thank you, Your Honor. May I approach? Yes. Thank you. Good morning. Good morning. As the deputy indicated, I am arguing for Stephen Myers with respect to... Could you move the microphone closer to your mouth? Oh, yes, of course. I'm sorry. Thank you. Is that better? Okay, very good. Thank you. So, this appeal was brought after a trial in front of Judge Voiland and a denial of Mr. Myers' motion to reconsider the trial court's underlying rulings. It was brought pursuant to Supreme Court Rule 304. There are several issues presented in this, for this court's review. Whether or not the award of indefinite maintenance to Ms. Myers was against the manifest weight of the evidence based on her de facto marriage relationship with her long-term boyfriend, Paul Greete. Whether the calculation in the award of maintenance and child support was correct. Whether the trial court's failure to rule on a pending petition to reduce child support that had been filed by Mr. Myers was against the manifest weight of the evidence. Whether or not Mr. Myers should have been required to repay monies given to the parties during the marriage and to Ms. Myers after the marriage. And whether or not the trial court should have awarded an annuity, a premarital annuity, that Mr. Myers had prior to the parties getting married. With respect to the first issue, the award of maintenance, and whether or not Ms. Myers was engaged in a de facto relationship, obviously the case law has continued to change and has actually, I acknowledge, swung toward not finding de facto marriage in many cases. And it seems from my reading of the underlying cases is that the financial intermingling or commingling seems to be the linchpin. And I think that that should not really be dispositive because I would submit to the court that there are many, many married and committed couples that have separate accounts and maintain separate finances. And I think that's not in the record. I'm sorry? Your opinion is not in the record. That is correct. But my argument with regard to I think the reason that the finances are not the sole thing to. What should we focus on? I think you should focus on basically is the entirety of the parties' relationship and the fact that it was a more than four-year relationship and that it was an ongoing relationship. And the fact that both parties testified that it was, you know, they had spent many times together. They spent COVID together. There were a myriad Facebook posts that they both posted about their relationship, Mr. Greete's relationship with the children. And one of the things I think that is important is there's a relationship with the children that is very sort of inter-familial. And, you know, you don't generally just put tattoos on your body of a person that you just are randomly dating for a little while. And Mr. Greete, you know, testified that he was at the house very often and the parties made dinner together and they took family vacations together. He attended graduations for Ms. Meyers' children. Ms. Meyers had Mr. Greete's cat and took care of his cat. Did the trial court comment on the tattoos? I don't believe that there was any significant mention of the fact that there were tattoos. I think it was, and I haven't looked at it. I read the whole thing again, but I don't recall that there was much about the tattoos. How many vacations were there? I'm sorry? How many vacations were there? I think the vacations to me were when Ms. Meyers took the children up to Wisconsin when Mr. Greete was living there. And they originally began dating in 2019. The parties were not living in the same state. And so Ms. Meyers would take the children up to see him. And I don't recall that there were any specific number of times that were given, if my recollection is correct. Ms. Meyers said a few times. So the record is relatively unclear about how many times she went to stay with Mr. Greete and the children up in Wisconsin when he was living there. Let me ask you this. Of course. As you conceded, the law has certainly evolved on this point over the last few years. And the issue here is whether or not the trial court's findings are against the manifest weight of the evidence. These are extremely fact-dependent analyses. How do we find, assuming we might have ruled differently, the three of us might have come up with three different conclusions based on these facts, where is a point where we can say this is against the manifest weight of the evidence, what the trial court decided? I believe that the manifest, the part where I think the judge didn't rule correctly, was the fact that these parties still, they both testified, their relationship was still ongoing. Mr. Greete was still at her, at Ms. Meyers' house, staying overnight. The parties continued to ostensibly sleep in the same bed. There was testimony about that. Ms. Meyers, I'm sorry, yeah, Ms. Meyers drove Mr. Greete to the trial. That this was a continuing relationship where he was at her home still during the pendency of this trial, I think shows the strength and the solidarity and the commitment of their relationship together. What was that relationship? Because it sounds to me like your syllogism is based upon the premise that this is a continuation of a de facto marriage, and therefore the fact that it's going on is further proof. If the appropriate premise was that this relationship was an intimate but not murder relationship, then the fact that it goes on for longer or is intermittent or whatever, doesn't establish that it's against the manifest weight of the evidence. I think that the... The point is that your argument presupposes that the trial court was wrong because it came to a different conclusion instead of telling us why the conclusion is improper. And in order to do that, you'd have to establish that what was before was a marital relationship if you're going to argue a continuation thereof. Because if it's a continuation of just an inmate relationship where they like to go hiking every once in a while and spend holidays together, that doesn't really establish that it's against the manifest weight. Okay. Well, I believe that it was a de facto relationship because we have one person that spent a week behind, you know, Ms. Meyer spent a week at Mr. Greets' bedside when he was in a coma. That's a pretty significant thing to do. You have a person who is at your home every day. That is, you're driving them to work because they don't have a car. They have a residence. They have a room somewhere. But I think it's very easily to infer that you've got some, excuse me, limited personal property somewhere because you're not really living there. You're living with your paramour and her family at her home and engaging in all of the activities that a married couple or parties engaging in that kind of a relationship have in that home. I have a question about the annuity. Yes. The trial court indicated why it decided not to grant the annuity to your client. It didn't explain why you didn't grant it to Kathleen. And I'm not quite certain I know from the record whether she was asking for it. But the case law seems to suggest that if your client were awarded that annuity, then that might impact whether or not the annuity would be considered for purposes of maintenance or support. And so based upon what the trial court said, which I think was, in essence, that proof without pleadings is as defective as pleadings without proof. And I believe he indicated that there was no petition or no testimony about the implications, the beneficiaries, et cetera. It was just a request for an award of the annuity. Why is that an abuse of discretion? Because it was an asset of one of the parties. This is certainly a double-edged sword for my client, because if it's awarded to him, the court could have considered it potentially income, which was one of the issues that was raised. However, it was an asset that my client did have prior to the parties getting married. And all I can say, since I wasn't the trial court attorney, is that it would have been included in the financial exhibits that were part of the underlying trial. What evidence or proof was presented that he should be awarded that? It would have just been on his financial affidavit. I mean, that is the only argument that I have for that, is that it would have been set forth as his asset in his financial affidavit. Thank you. So that's the necessary or the minimum amount of proof that is required for him to award something? Your Honor, I think so, because it says that it is an asset. It is a thing of value, potential value to one or both of the parties. And if it's just left out there without theoretical ownership, then if it doesn't belong to my client, then the income, any potential income, wouldn't belong to my client either. I'm not going to go any further into this area, because I would be hypothecating about the nature and extent, the characteristics of the annuity. Things like who contracted for it, who signed for it, and so on and so forth. But it's somewhat difficult for me to understand how you're asking the court to award something that apparently has already been, through negotiations and contractual relationships and a release of satisfaction and discharge and liability, would be independently established regardless of what the divorce court said. Unless, of course, he's going to impute it as marital property, because the monies were being expended and contributed towards the marriage after the fact, in which case, if there's no information or evidence to that effect, wouldn't that be subject to reversible error and stanter on the basis that there's no evidence to establish or present relative to... Because you wanted it as non-marital property award, correct? Not awarded as marital property. That is correct, Your Honor. So I'll just end with this and see if you can answer it. Okay. Did it, through the passage of time and the use of the money for the general welfare of the marriage, did it get transmuted into marital property, at least to a certain percentage? I don't believe there was any transmutation necessarily. Certainly, monies that were spent on the marriage could be interpreted as a gift. I would acknowledge that. That's, I think, the general consensus. If you would spend non-marital funds to benefit of the marriage without anything indicating that those monies would be repaid, that's considered a gift to the marital estate. But I don't believe that amounts to transmutation. That's one step beyond whether or not it can be used for support or maintenance. I understand. I thought I was trying to answer your question, Your Honor. I realized after I asked the question that it doesn't necessarily, it's not necessarily directed to what the real issue is, which is whether or not, regardless of who owns it, whether it was used in such a way that the law says that it can be used to support the wife in maintenance and the children in child support. Do you want to talk about the amount of maintenance? That was your second issue. Yes. With respect to that, I think the first error was that Ms. Myers' own attorney indicated in her trial testimony in the exhibits that she was able to earn at least $2,600 a month, but the trial court imputed $1,900 a month to her. But the trial court also found that Ms. Myers was under no particular disability and not able to work on a full-time basis. And so I think there's a disconnect between an imputation and acknowledgement that somebody can work at basically a minimum wage level versus an imputation that they would be working at less than full-time, even though able to do so. And obviously the position that I set forth was that this was, this amounted to a deviation below guidelines without any specific findings for that. And the other issue that I rose, that I raised, I'm sorry, was that at the time of Did you want me to finish answering the question? At the time of trial, Mr. Myers had been unemployed, laid off through the union, had remained with the union for roughly a year and a half, was maintaining union benefits, had been receiving unemployment compensation, but that had ended by the time of trial and it had been several months that he had not been receiving any income other than the funds from the annuity. And so the trial court's use of the unemployment income on top of the annuity money overstated what Mr. Myers was actually working. So there was an incorrect At the time of the judgment, there was no further unemployment income coming in? Yes, Your Honor. Actually, at the time of the trial, the unemployment income had stopped. And so the understatement of Ms. Myers' ability to earn income and the overstatement of what Mr. Myers was actually earning, I believe, resulted in an incorrect calculation of both child support and maintenance. You said he was laid off by the union? Yes, Your Honor. How does a union lay off anyone? They don't offer them jobs. All of the jobs that Mr. Myers got were specifically from the union. He wasn't allowed to work anywhere else. And so he did not have anything offered to him from the union. That's the definition of being laid off? I don't know what other words... At least under a union? I was under the impression that if you belong to a local union, you don't necessarily get laid off. What ends up happening is that the names of the union members are put on a list. And they go down the list. When they come to your name, they ask if you want it. And if you don't want it, then you pass. That isn't a layoff. It was the layoff in part because there was COVID unemployment compensation that was much larger than what would normally be considered unemployment compensation. Your Honor, I can't answer that. Those facts were not in the record. I don't believe that came from anything at the trial. So there was no explanation on the record what laid off meant? Correct. And laid off would be also the term that I would use. I'm not personally familiar with necessarily the workings of a union. My understanding from the record is that there were no jobs offered to Mr. Myers during that period from the union. And he was required to work through the union to maintain his benefits. Okay. Any other questions? His being laid off, that was uncontested, correct? That is correct. Okay. No. Mr. Kennedy? No. You'll have an opportunity to make the button. Thank you. Understood. Thank you for your time. Ms. Perko, you may proceed. Ms. Perko? Yes, Your Honor. I think Exhibit 16, I believe it was referenced between $1,900 and $2,600. You're asking me about Exhibit 16? It was supposedly an exhibit that the trial attorney submitted for income for your client. And I believe it indicated $2,600. And I looked for that as recently as the day before yesterday and did not find that she claimed over $2,000 as opposed to the $1,900. So I'm sorry, but I didn't find it. The column for Stephen, I think, was around $10,000 of income. Do you remember that? Well, apparently you're referring to this Exhibit 16. This is an exhibit. I'm not sure we're talking about the same thing. So Exhibit 16 is a five-page document. And at the left it has dates. And in the center it has amounts of money. And at the end it has a supposed statement of accounts. I have referred to this particular document a few times in the course of my answer brief because it is our position that this piece of paper shows absolutely nothing because it is incomprehensible. It's what? Incomprehensible. And so at the very conclusion of the five-page document, there are some representations, I guess, of how these, of what, let's say, a summary of what this document supposedly shows. And it supposedly shows that, according to the argument by the appellant, it supposedly shows that my client made over $100,000 in the course of a two-year period. We don't know the genesis of this document, but it is referred to at least twice, and I believe more times, as a justification for denying maintenance in this case. So I'm not sure we're talking about the same document. I'm just saying that Document 16 is what I believe I've just recited. Was it admitted? No. It is part of a stipulation that the parties entered into that it could be admitted into evidence. But at trial, there's no discussion of it. When you say discussion, are you saying no testimony about what it means? Correct. No testimony. About who wrote it for, who compiled it, for instance. I mean, I think that logically we believe that it was offered by the defendant, Stephen. But we don't really know that. Well, wait a second. If it was stipulated to that it could be admitted, isn't that all those objections waived? Well, you don't know. Whether you knew it or not. But if you stipulate to the admission of a document, you can't come back later and say, well, it shouldn't have been admitted. Because there's no basis, there's no genesis, we don't know who wrote it, we don't know where the information came from. Why just stipulate to its admission? Well, they stipulated. Now you. I appreciate you watching. No, I understand your honor. No, but it was stipulated to with a very large number of documents because, you know, a very large number of documents. And then it was never discussed. So there is no explanation. And it's our position that these five pages, in and of themselves, with these long columns of information, I mean, we don't, I truly, it's our position that we don't really even know how to read this document. It is just a list of, it's just a list. Sometimes in the document, which actually I brought with me because, well, because it's an important document, because our opponents rely on the document for their arguments. But, for instance, there are numerous entries on the document that say unknown as the comment in the center portion of the document. But, again, you stipulated to it. Yes, it's an evidence for what it's worth. And it is, I mean, that's my understanding of, you know, the admission of documents or whatever else that may have minimal probative value. This particular document, we're saying, has zero probative value. And certainly it's not sufficient to carry all the weight for the proof of whatever is at issue. And the two matters that are, for which this document is predominantly used at trial, is for, in the question of the maintenance of payments, not so much, but in terms of whether or not there is conjugal, a conjugal relationship. Certainly very probative on that, you know, certainly sought to be very probative on that issue. Okay. What about the failure of the court to award the annuity as non-marital property? Well, I mean, we've answered that particular allegation with a discussion of whether or not an issue is justiciable. And our understanding of the law is that in order to raise an issue at trial, there has to be a procedure in place. And, I mean, there's no procedure followed in this case in terms of pleadings. So there are no pleadings that address this annuity question. I think that that is what the trial judge was saying in this case, that there is not a construct for raising the issue of ownership without a pleading. We don't even know what we're looking at. And, indeed, in this case, I mean, a whole lot of questions could have been avoided or answered if we were sure that the document truly, in common terms, belonged to Stephen and was not the part of some other larger construct. So in terms of awarding, we think that there's not enough information in the case to award, to make any award on this. The trial judge himself said that he was using the income only for support purposes. There was a petition that allegedly the trial court didn't rule on. There is an allegation that he didn't rule on. A petition to modify? Correct. But the dates in that regard are, I forget the precise dates, but they go from the period before trial. The trial judge, in the findings of the very judgment, talks about the time frames that the petition to modify related to? Well, it would be our position that the court took into consideration not only the arrearages in this matter, but also the unadjudicated arrearages. And that all of that was decided by the trial court and is reflected in the judgment. Do you know anywhere in the record where the motion was specifically referenced for purposes of presenting evidence on point? I do not. Any comment about the tattoos? Well, the tattoos were six months into the relationship. Six months into the relationship, yes. So, you know, in terms of how the tattoos even, you know, relate to the question of maintenance, we would submit that the parties were not making a decision about permanence or anything else six months into the relationship. You asked a question of my opposing counsel, and I would submit that the subject that really makes a difference between a casual relationship or a relationship that does not involve permanency, that is really, to me, the issue in, you know, kind of the bottom line issue in the whole question of whether or not a conjugal relationship exists. And it is the anticipated, at least the anticipated permanence of the situation. And I don't think that those kinds of, I mean, you're looking now at a period of three or four years that these people have known one another. What's missing? With that roster of factors that the court considers, what possibly is missing for us not to conclude that this was a de facto marriage? Well, the issue of permanence, I think. That's a conclusion. Give me facts that would support your conclusion that there was no permanence. Well, I think that the courts are directing, you know, I'm not really sure if I read this in an opinion or if I read this in some other commentary, but the ideas that I believe I've gleaned is that the most significant issues are whether or not there was a common residence, and indeed that's legislative language, so, you know, of being resident. So of sharing a common residence and of sharing some nature of financial intertwining in the relationship. And those are absent in this case. And particularly it therefore was important, I think, for the appellant to establish that there was that kind of relationship in terms of residence and in terms of financial considerations. Those are exceedingly weak in this case. Because the indications are that Mr. Greete could pack up his suitcase tomorrow and leave. And in the first place, Mr. Greete did not spend, and the issue of how much time was spent is addressed a lot in the case law. And his relationship with my client simply did not include a long period, long periods of being resident. I mean, it was a day here or a day there, a weekend here or a weekend there. That is not the kind of permanence and the kind of commitment I think that is anticipated and required to establish a conjugal relationship. So my time is wrong, are there? No. Thank you. Thank you very much. I will be quite brief. With regards to the Exhibit 16 that counsel was referring to, I think it goes back to the original fact that the wife still had the ability to earn an income of what was actually stated in the trial exhibits. And the fact that Ms. Meyer's attorney failed to draw forth any questions or testimony about it, I think should be held against her because it was a stipulated exhibit, an evidence the trial court considered. Very quickly, with regard to the petition to reduce maintenance, while we were sitting here, I looked very quickly. There's no mention of that petition to reduce maintenance in the underlying trial court's judgment. I didn't see anything where he referenced the consideration of the pending motion to reduce child support. I think that just, it got missed. And the fact that it was from before trial makes a lot of sense, because this was an order, it was an interim order, it was a temporary order, and it was specifically reserved by court order a couple of times over to the time of trial. And then with regard to the relationship, tattoos are very permanent. Tattoos are quite permanent. And I think that as far as the financial intertwinement, there was very brief testimony about the fact that, I think it was from Ms. Meyer's that she and her boyfriend discussed that if they lived together, her maintenance was going to end. So I think that they had a cognizance for, they knew that if they did something, they intertwined their finances. It was going to impact her ability to have maintenance. And then with respect very briefly to the residence, Mr. Greete, he had a room that he rented. And the statement that he could have just gotten up and left at any time, well, gosh, anybody can do that, even in a marriage. And so I think that they did. What accounts did they have together? They didn't have any together. And I submit to the court that it was because Ms. Meyer's and her paramour knew that that was a factor that could possibly affect her ability to receive maintenance. And like I said, I was going to keep it brief and I don't have anything else, but if the court has any questions. It's a little bit like saying that the reason why they aren't married is because they didn't take marriage vows. And in that sense, the syllogism is accurate. Any other questions? Are you done? Because I thought you wanted to say something else. No, I thought you were going to ask me a question and I was actively listening. You may proceed. Well, it's an interesting policy question as to how much do we as a court on any level look to the motive of divorced or getting divorced parties as to staying just this side of the line. That, if you will, which is a little sketchy, but a line between a relationship and a relationship that would qualify as a de facto marriage. Do we look at motive? Do we consider those factors? And if so, wouldn't consideration of that lie with the legislature rather than us? Well, I think that we have to take the statute as written and there is a case and I'm going to have to apologize to the court. I can't remember the name of it, but I did cite it in my brief where there's a specific language that if there's a purposeful engagement in activities knowing that it's going to affect your maintenance, the court can and should consider that. And as far as policy questions, you're right, it is a policy question. But I think we have to take the statute as it is written right now. Okay. Didn't Kathleen testify that she determined pretty early on in the relationship that even though they had a relationship, she didn't think it would ever work out? She did testify, but she did testify about she wasn't sure that it was going to work out. But four years later, they're still, they're driving to trial together. They're sleeping in the same bed. He's still at her house. They're still spending his time. So, I mean, I don't know who goes into a relationship knowing if it's going to work out or not. I mean, isn't that sort of the whole point of dating is that I'm going to find out if I like you or not and I want to spend time with you or not. And if you don't, you go your own separate ways. Well, the question I asked would normally be followed with the reminder that controverted issues of fact, we defer to the findings, if it's based upon credibility especially, of the trial court judge. And since there was testimony that she didn't see it happening and neither did he, how do we determine that they were inaccurate or worse insofar as their representations, regardless of how long their relationship has continued? I think you can take the representations for what she believed at the time she made it, that they were starting off a relationship she didn't know was going to last. And the fact that it did continue and had continued for up through four years. So I think you can take the testimony for what it was, but then look at what actually happened and both things can be true. Fair enough. I have no further questions. Thank you.